# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| LAURA ORT, | : | Case No. 3:18-cv-286 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## DECISION AND ENTRY

## I.    <u>Introduction</u>

In July 2014, Plaintiff Laura Ort applied for period of disability, Disability

Insurance Benefits, and Supplemental Security Income.  Her applications were denied

initially and upon reconsideration.  After a hearing, Administrative Law Judge (ALJ)

Deborah F. Sanders concluded that she was not eligible for benefits because she is not

under a "disability" as defined in the Social Security Act.  Plaintiff brings this case

challenging the Social Security Administration's denial of her applications benefits.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the

Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12),

and the administrative record (Doc. #5).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Sanders's non-disability decision.

## II. <u>Background</u>

Plaintiff asserts that she has been under a "disability" since January 31, 2014. She was forty-four years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). She has at least a high school education. *See id.* §§ 404.1564(b)(4), 416.964(b)(4).[1]

### A. Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Sanders that she stopped working because "[m]y body just literally quit. I worked until I dropped." (Doc. #5, *PageID* #221). She does not know the exact date she stopped working because she has some long-term memory issues from a motorcycle accident. *Id.* She was the passenger on a motorcycle that "hit a rock just the wrong way." *Id.* at 222. She was "ejected and thrown about 20 feet." *Id.* She sustained a head injury and broke her back. *Id.* As a result of the head injury, she began having seizures again (as a child, she was epileptic). *Id.* Her last seizure was in 2011. *Id.* at 223.

Plaintiff explained that she in not able to work because of chronic pain. *Id.* She described her problem as a catch 22; "my body needs to rest, but if it rests too long with the arthritis that I have, and all the bone problems and joint problems, if I am inactive for

---

[1] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

more than 30 minutes at a time, it's severe. The more I don't move, the more I tighten up." *Id*. When she moves, her arthritis causes her to pop, crack, and snap. *Id*. But she tries to keep going. *Id*. Plaintiff can sit in a chair for five to thirty-five minutes at a time, depending on her positioning and the chair. *Id*. at 223-24, 228. She can stand for five to ten minutes before she has to sit down. *Id*. at 229. She thought she could stand for a total of one hour in an eight-hour day. *Id*. at 240. Sometimes, she cannot sleep for a day or two at a time because she is in so much pain. *Id*. at 224. Other times, she can sleep for twelve to sixteen hours. *Id*.

Plaintiff has fibromyalgia. At times, she can touch her skin and it feels bruised. *Id*. at 224. She takes several pain medications. Her seizure medicine, gabapentin, is considered a pain medication as well. *Id*. at 233. She uses lidocaine patches every day and takes methocarbamol as needed. *Id*. Her doctors sometimes prescribe Percocet. *Id*.

Plaintiff has lower back pain that travels to the front of her left leg at the top and into her tailbone area. *Id*. at 231-33. On a scale from one to ten, her pain is typically at five to six. *Id*. at 233. She has difficulty bending over and stooping down. *Id*. at 231. She cannot crouch or crawl. *Id*. She uses a device to help put on her socks because of her SI joints and a steel bar in her back that prevents her from bending. *Id*. She also uses a long shoehorn to get her shoes on and off. *Id*. at 232. After her back surgery in February 2016, Plaintiff continued to see pain management but not on a regular basis. *Id*. She has also had to get injections in her back because of pain. *Id*.

Additionally, Plaintiff has right shoulder pain. *Id*. at 234. Her doctors recommended surgery but she had to choose whether to have back surgery or shoulder

surgery first, and she chose back surgery. *Id.* She has difficulty lifting her right arm over her shoulder, out to the front, and out to the side. *Id.*

Plaintiff has problems with both ankles as well. *Id.* at 235. She has severe pain that starts three to five inches above her ankles and goes to the tops of her feet. Her doctors have not yet determined the cause. *Id.* She had pain in her heels but it stopped after she had injections. *Id.*

One of her doctors prescribed Plaintiff a cane a year before the hearing to help her walk and prevent her from falling. *Id.* at 228-29. Plaintiff also used a walker with a seat before her back surgery. *Id.* at 228. Nonetheless, she falls every three to four weeks.

She has issues with her hands. She has tendinitis and possibly carpal tunnel. *Id.* at 239. Her hands ache, particularly between her index finger and thumb. *Id.* She has difficulty holding a pen. She drops things without realizing it is going to happen. *Id.* On her left hand, her index finger and thumb lock up in strange positions. *Id.*

Plaintiff has breathing issues. At times her oxygen level drops to dangerous levels. *Id.* at 225. When that happens, she gets disoriented and confused. *Id.* It first happened when she had back surgery and it happened again when she had gallbladder surgery. *Id.* at 226.

Plaintiff's pain has affected her mental health. "It makes me very depressed and angry, hateful. It makes me withdraw, I've lost people in my life, a lot of people." *Id.* at 238. She has depression and anxiety. She has crying spells at least once a week that last for a minute or a minute and a half. *Id.* at 237. Thoughts about her life—not having a boyfriend or normal life—trigger crying spells. *Id.* She has mood swings, "[m]ore on the

negative side, the depressed side, angry." *Id.* She described her energy level as "[v]ery poor and her ability to concentrate on a task as "[n]ot very well." *Id.* Plaintiff sees her psychiatrist, Dr. Moody, once a month. *Id.* at 236. He prescribes Celexa and Xanax. *Id.*

Plaintiff uses marijuana two to three times a week to take her mind off her pain. *Id.* at 230. She ingests it rather than smoking it. *Id.* She also smokes cigarettes, albeit not very often. *Id.* at 230-31. She smokes less than half a pack per month. *Id.* at 231.

Plaintiff testified that she is "basically homeless" and "float[s] from friend to friend's house." *Id.* at 217. She does not have any responsibility for cleaning or chores. *Id.* at 219. She does laundry once per week. However, she only puts the clothes in the washer and folds them after they dry. Her friend takes them out, puts them in the dryer, and gets them out. *Id.*

During the day, she watches TV, looks at Facebook, deals with her body, and keeps moving and resting. *Id.* at 218. She has a driver's license but only drives to appointments and when necessary. *Id.* In an average week, Plaintiff has two to four appointments that last for up to an hour and sometimes more. *Id.* at 224. She sees a psychologist once a week, psychiatrist once a month, pulmonologist twice a month (at least for that month), and orthopedic doctors once or twice a month. *Id.* at 224-25, 227. She drives to the grocery store two to four times a week because she cannot carry heavy bags and she has no permanent place to live. *Id.* at 219. For example, she cannot carry a gallon of milk to she buys pints and half gallons. *Id.*

**B.    Medical Opinions**

　　　*i.    Barbara A. Bennett, D.O.*

Dr. Bennett, Plaintiff's treating family-care physician since 2005, completed interrogatories and a medical assessment in August 2016.  She has treated Plaintiff for anxiety, chronic pain, depression, osteoarthritis, arthritis, neuropathy, asthma, COPD, reflux, joint pain, muscle pain, fibromyalgia, seizures, fatigue, amnesia, headaches, and ankle, back, neck, and hip pain.  *Id.* at 1061.

Dr. Bennett opined Plaintiff could frequently carry up to five pounds.  *Id.* at 1056. Plaintiff tremors, osteoarthritis, and back issues make it hard for her to lift or carry anything heavy or for a long period of time.  *Id.* at 1055.  She can stand and walk for five minutes at a time for a total of thirty minutes in an eight-hour day.  *Id.* at 1056.  She can sit for thirty minutes without interruption for a total of five hours in an eight-hour workday.  *Id*.  She cannot climb, balance, stoop, crouch, kneel, or crawl.  *Id.* at 1057.  Her ability to reach, handle, finger, feel, push, or pull are also affected by her impairments. *Id*.  Specifically, she has trouble doing those things due to her chronic pain and tremors. *Id.*  She should avoid all exposure to heights, moving machinery, chemical, temperature extremes, vibration, dust, fumes, and humidity because they could cause lung issues, coughing, an inability to breath, and increased pain.  *Id.* at 1058.  Dr. Bennett concluded Plaintiff does not have the residual functional ability on a sustained basis to do sedentary work.  *Id*.  She explained, "[Plaintiff] has [a] hard time getting to her appointments [and] sitting in our office, she is trying physical therapy but [is] still having chronic widespread pain."  *Id.*

Additionally, Dr. Bennett opined that the combined effects of Plaintiff's physical and mental impairments result in a greater degree of functional limitation than her physical impairments alone. *Id.* at 1061. She explained that Plaintiff "has suffered from chronic pain for several years and … it has caused depression [and] anxiety that both [a]ffect her life now." *Id.* at 1061.

Because Plaintiff's pain and depression affect her sleep, Dr. Bennett opined that Plaintiff could not be prompt and regular in attendance on a sustained basis. *Id.* at 1062. Further, she cannot demonstrate reliability because she has chronic pain and does not know when she will have flare ups. *Id.* at 1065.

She cannot behave in an emotionally stable manner, relate predictably in social situations, or respond appropriately to supervision, co-workers, and customary work pressures. *Id.* at 1063-64. She does not like social situations and once she starts feeling uncomfortable, she could have a panic attack. *Id.* at 1064. She also would struggle to communicate with co-workers "because she would not want to communicate [with] anyone." *Id.* at 1066. Pressure at work, including criticism from supervisors could cause her to have a breakdown. *Id.* at 1063, 1067.

She cannot understand, remember, and carry out simple work instructions without requiring close supervision. *Id.* at 1064. She has a history of amnesia and she could forget simple instructions. *Id.* She cannot maintain concentration and attention for extended periods because she has issues remembering things (due to her motor vehicle accident) and cannot focus on something for two hours. *Id.* at 1065.

Plaintiff has extreme restrictions of activities of daily living; extreme difficulties in maintaining social functioning; and extreme deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner. *Id.* at 1068.

ii.     *Debra K. Sowald, Psy.D.*

Plaintiff's treating psychologist, Dr. Sowald, completed a mental impairment questionnaire in October 2016. She diagnosed Major Depressive Disorder; Post Traumatic Stress Disorder; Generalized Anxiety Disorder; Panic Disorder with Agoraphobia; Somatic Symptom Disorder; Attention Deficit Hyperactivity Disorder, Combined Type; and Pain Disorder with related psychological factors. *Id.* at 1145. Further, Dr. Soward indicated that other conditions affect Plaintiff's psychological status, including chronic back and neck pain, back surgery, tailbone pain, fibromyalgia, bursitis, leg and hip problems, chronic obstructive pulmonary disease, ADHD, irritable bowel syndrome, gall bladder issue (polyp is blocking it), heel and ankle pain, and seizures. *Id.* at 1145-47.

Plaintiff's symptoms include poor memory, sleep disturbance, personality change (with health problems and pain), recurrent panic attacks, paranoia or inappropriate suspiciousness, difficulty thinking or concentrating, social withdrawal or isolation (Laura is working on this in therapy), decreased energy, intrusive recollections of atraumatic experience, generalized persistent anxiety, somatization unexplained by organic disturbance, depression, severe and chronic pain. *Id.* at 1147-48. Plaintiff also struggles with personal hygiene and "cannot get herself to shower regularly, only when she is going to a medical appointment." *Id.* at 1148.

Dr. Sowald indicated that Plaintiff's symptoms are severe—45 to 50 out of 100. She explained, "Laura is unable to work, avoidant of crowds, unable to take adequate care of herself or her environment; and she is anxious in small groups. Her pain rules out most activities. She seldom even watches television. She sleeps most of the day. Her PTSD keeps her avoidant of many situations and relationships, and makes her anxious when driving." *Id.* at 1147.

Dr. Sowald opined, "Laura's many disorders leave her immobilized at times …." *Id.* at 1148. "[Her] anxiety causes her to shake visibly, and increases all of her other pain disorders. Her depression leaves her unable to take care of her personal care and her environment, and leaves her exhausted by limited exertion." *Id.* at 1150. Because she cannot work, she has struggled with her finances. *Id.* at 1148. She stopped opening her mail for years because she could not pay any bills. *Id.* She was homeless and had to stay with friends because the State of Ohio repossessed her grandmother's condominium, where Plaintiff lived. *Id.* And, her inability to work "makes her feel terrible, as if she has no purpose in life, and leaves her hoping that her next life will be better. She visualizes about it." *Id.*

Plaintiff's treatment includes individual and group psychotherapy as well as psychotropic medications. *Id.* at 1149. She also uses an Alpha-Stim AID unit[2] to help

---

[2] According to its website, "The Alpha-Stim electrotherapy device relieves post-traumatic, acute and chronic pain through painless electrical stimulation delivered via two handheld Smart Probes." ALPHA-STIM, www.alpha-stim.com (last visited Sept. 18, 2019).

control her frequent anxiety, decrease her depression, assist her in relaxing to sleep, and aid in decreasing her pain level. *Id.* at 1150.

Dr. Sowald noted that Plaintiff has "weird reactions to medications." *Id.* at 1149. "With her adult ADHD, Laura has a unique response to Xanax of it energizing her and helping her focus to get tasks done …. Unfortunately, with the State of Ohio pressuring physicians to decrease prescribing Benzodiazepines, Laura's Xanax has been decreased to a level where she is getting immobilized again. With the decrease, Laura's feeling functional has decreased." *Id.* at 1149-50.

Dr. Sowald opined that, overall, Plaintiff has made steady progress and her prognosis is good. *Id.* at 1150. However, "she has quite a distance to go to be functioning at the level she needs to be at." *Id.* Dr. Sowald opined that, on average, Plaintiff would be absent from work more than three times a month because of her impairments and treatment. *Id.* at 1151. Further, she has extreme restrictions of activities of daily living; extreme difficulties in maintaining social functioning; extreme deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and extreme episodes of deterioration or decompensation in work. *Id.*

iii. *Fred Greaves, Ed.D., &amp; Juliette Savitscus, Ph.D.*

Dr. Greaves reviewed Plaintiff's records in December 2014 and found she had several severe impairments: disorders of back–discogenic and degenerative; dysfunction–major joints; peptic ulcer; chronic liver disease; COPD; asthma; disorders of muscle, ligament, and fascia; fibromyalgia; affective disorders; and anxiety disorders. *Id.* at 261. He opined that she has a mild restriction of activities of daily living; moderate

difficulties in maintaining social functioning; moderate difficulty in maintaining concentration, persistence or pace; and no episodes of deterioration or decompensation. *Id.* Plaintiff is able to perform simple routine tasks in an environment that does not require fast pace or high production demands. *Id.* at 266. She is able to have brief, superficial contact with others and can adapt to minor, infrequent changes in the workplace. *Id.* at 267.

In August 2015, Dr. Savitscus reviewed Plaintiff's records and agrees with the majority of Dr. Greaves' findings. However, she found that Plaintiff had one additional severe impairment—ADD/ADHD. *Id.* at 280. Further, she has a moderate restriction of activities of daily living. *Id.* Plaintiff "retains the ability to understand and remember 1-3 step tasks consistently and 4-5 step tasks occasionally." *Id.* at 285.

> iv. *Elizabeth Das, M.D., & Leon D. Hughes, M.D.*

Dr. Das reviewed Plaintiff's records in December 2014. She opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently. *Id.* at 263. She can stand for a total of six hours in an eight-hour workday and can sit for six hours total. *Id.* She can occasionally push and/or pull with her upper and lower left extremities. *Id.* She cannot climb ladders, ropes, or scaffolds. *Id.* She can occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl. *Id.* at 263-64. She can frequently balance. *Id.* at 264. She is limited to occasional overhead reaching. *Id.* She should avoid concentrated exposure to extreme heat or cold; and humidity; fumes, odors, dusts, gases, poor ventilation. *Id.* at 264-65. She should avoid even moderate exposure to

hazards such as machinery or heights. *Id.* at 265. Dr. Das concluded that Plaintiff is not under a disability. *Id.* at 269.

In May 2015, Dr. Hughes reviewed Plaintiff's records and affirmed Dr. Das' assessment. *Id.* at 289.

### III.    <u>Standard of Review</u>

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard

is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance …." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.    The ALJ's Decision

As noted previously, it fell to ALJ Sanders to evaluate the evidence connected to Plaintiff's applications for benefits. She did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. §§ 404.1520, 416.920. She reached the following main conclusions:

Step 1:     Plaintiff has not engaged in substantial gainful employment since January 31, 2014.

Step 2:     She has the severe impairments of degenerative joint disease, cervical radiculopathy, osteoarthritis, degenerative disc disease, lumbar,

peripheral neuropathy, fibromyalgia, bilateral plantar fasciitis, chronic hepatitis C, major depressive disorder, generalized anxiety disorder, cannabis disorder, gastroesophageal reflux disease, chronic obstructive pulmonary disease, and asthma.

Step 3:      She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:      Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002), consists of "sedentary work … except occasionally push and pull[;] stand and/or walk 2 [hours] of an 8-hour day, changing position from standings and/or walking to sitting after every 20 minutes of standing and/or walking, sit 6 hours of 8-hour day, shifting positions after 45 minutes of sitting for a couple of minutes before resuming sitting, occasionally use foot controls and hand controls, occasionally climb ramps and stairs, never climb ladders/ropes/scaffolds, frequently balance, occasionally stoop, kneel, crouch, crawl, occasionally engage in overhead reach, never work at unprotected heights, around moving mechanical parts, never operating a motor vehicle, avoid concentrated exposure to extreme heat/cold/humidity, avoid concentrated exposure to irritants such as fumes, odors, dusts, gases, and poorly ventilated areas; capable of performing simple, routine, repetitive tasks but not at a production rate pace[;] occasional interaction with coworkers but no shared tasks[;] no over-the-shoulder supervision, no work in customer service capacity, can adapt to minor infrequent changes that are explained in advance, and may be off-task 5% daily."

Step 4:      She is unable to perform any of her past relevant work.

Step 5:      She could perform a significant number of jobs that exist in the national economy.

(Doc. #5, *PageID* #s 56-74).  These main findings led the ALJ to ultimately conclude that

Plaintiff was not under a benefits-qualifying disability.  *Id.* at 73.

## V.     Discussion

Plaintiff contends that the ALJ erred in evaluating the medical source opinions and
medical evidence.  The Commissioner maintains that substantial evidence supports the
ALJ's decision.

### A.     Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when
weighing medical opinions.  "Key among these is that greater deference is generally
given to the opinions of treating physicians than to those of non-treating physicians,
commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations
omitted).  The rule is straightforward:

> Treating-source opinions must be given "controlling weight"
> if two conditions are met: (1) the opinion "is well-supported by
> medically acceptable clinical and laboratory diagnostic
> techniques"; and (2) the opinion "is not inconsistent with the
> other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20
C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how
much weight is appropriate, must consider a host of factors, including the length,
frequency, nature, and extent of the treatment relationship; the supportability and
consistency of the physician's conclusions; the specialization of the physician; and any
other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight
placed upon a treating source's opinions.  *Wilson*, 378 F.3d at 544.  This mandatory

"good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.* Substantial evidence must support the reasons provided by the ALJ. *Id.*

The ALJ first addressed the opinions of Plaintiff's treating physician, Dr. Bennett. The ALJ concluded that Dr. Bennett's "pre-alleged onset statements (albeit a few months)" were not entitled to controlling weight or any weight at all. (Doc. #5, *PageID* #71); *see* Doc. #5, *PageID* #873. The ALJ next addressed Dr. Bennett's August 2016 opinion. However, in evaluating her later opinion, it is not clear if the ALJ considered either condition of the treating physician rule.

The ALJ did not directly address the first condition of the treating physician rule—whether Dr. Bennett's opinions were well-supported by medically acceptable clinical and laboratory diagnostic techniques. As a result, it is difficult to determine whether the ALJ considered the first condition of the treating physician rule or supportability as a factor. Specifically, the ALJ discounted Dr. Bennett's opinion that Plaintiff can never climb, balance, stoop, reach, or do sedentary work on a sustained basis because "these are not realistic limitations based on physical exams from this provider and other providers throughout the record." (Doc. #5, *PageID* #71). The ALJ did not give any further explanation. However, earlier in her decision, she discussed medical evidence, including objective evidence of Plaintiff's severe impairments—evidence that supports Dr. Bennett's opinion. For example, in April 2014, shortly after Plaintiff's

alleged disability onset date, x-rays revealed mild osteoarthritic changes to her sacroiliac joints and prominent degenerative changes to her lower lumbar spine. *Id.* at 515. Additionally, x-rays showed moderate diffuse degenerative changes to her lower lumbar spine "appearing stable" and severe disc narrowing with grade 1 anterior spinal listhesis of L5 on S1 with associated severe degenerative disc disease changes—all stable. *Id.* at 514.

Despite the objective evidence, the ALJ focused on evidence in the record that does not support Dr. Bennett's opinions (such as normal examinations). If the ALJ was addressing the first condition of the treating physician rule, she erred to the extent that she required Dr. Bennett's opinion to be fully supported by objective evidence. This is because, "For a medical opinion to be well-supported by medically acceptable clinical and laboratory diagnostic techniques, it is not necessary that the opinion be *fully supported* by such evidence." Soc. Sec. R. 96-2P, 1996 WL 374188, *2 (July 2, 1996) (emphasis added). To the extent the ALJ was addressing supportability as a factor, this constitutes error because "these factors are properly applied only after the ALJ has determined that a treating-source opinion will not be given controlling weight." *Gayheart,* 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)).

Next, the ALJ discounted Dr. Bennett's August 2016 assessment because it "does not comport with the record."[3] (Doc. #5, *PageID* #71). The ALJ similarly did not

---

[3] She only gave one example. According to the ALJ, Dr. Bennett's opinion that Plaintiff can only stand for 20 to 30 minutes conflicts with Plaintiff's admission that she takes her pets for walks for 20 to 25 minutes. (Doc. #5, *PageID* #s 70-71). This is somewhat puzzling because Dr. Bennett opined Plaintiff could stand for almost the exact amount of time Plaintiff walks. Because there is no conflict between her opinion and Plaintiff's walks, substantial evidence does not support the ALJ's conclusion.

directly refer to the second condition of the treating physician rule—whether the opinion is not inconsistent with the other substantial evidence in your case record.

To the extent the ALJ intended to discuss the second condition, she failed to determine whether Dr. Bennett's opinions were "not inconsistent" with the record. This distinction is important because, the Social Security Administration defines "not inconsistent:" as "a term used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." Soc. Sec. R. 96-2p, 1996 WL 374188, at *3 (Soc. Sec. Admin. July 2, 1996).

The ALJ found that Plaintiff's largely normal physical exams conflicted with Dr. Bennett's extreme limitations. Yet, substantial evidence does not support this conclusion. Why? Because "persons suffering from fibromyalgia 'manifest normal muscle strength and neurological reactions and have a full range of motion.'" *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 778 (6th Cir. 2008) (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir.1988)). The ALJ found fibromyalgia to be a severe impairment but then ignored its symptoms. This constitutes error.

Even if Dr. Bennett's opinions are not entitled to controlling weight, "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927." Soc. Sec. R. 96-2P, 1996 WL 374188, at *4. In the present case, the ALJ ignored or overlooked several factors. For example, the ALJ did not acknowledge that Dr. Bennett has treated Plaintiff for over

twenty-five years.  (Doc. #5, *PageID* #526); *see* 20 C.F.R. § 404.1527(c)(2)(i)

("Generally, the longer a treating source has treated you and the more times you have

been seen by a treating source, the more weight we will give to the source's medical

opinion.  When the treating source has seen you a number of times and long enough to

have obtained a longitudinal picture of your impairment, we will give the medical

source's medical opinion more weight than we would give it if it were from a nontreating

source.").

The ALJ likewise did not acknowledge that Dr. Bennett's treatment notes include

multiple reports from specialists.  *See* 20 C.F.R. § 404.1527(c)(2)(ii) (Generally, the more

knowledge a treating source has about your impairment(s) the more weight we will give

to the source's medical opinion.  We will look at the treatment the source has provided

and at the kinds and extent of examinations and testing the source has … ordered from

specialists and independent laboratories.").  For example, in July 2016, Jeffrey S. Rogers,

D.O., examined Plaintiff upon Dr. Bennett's referral.  And his notes support Dr.

Bennett's opinions.  For instance, he noted that, upon exam, Plaintiff was "frustrated with

[her] pain."  (Doc. #5, *PageID* #841).  She had an antalgic gait, unsteady station, and

decreased balance.  *Id.*  Her spinal range of motion was limited due to pain; she had pain

with flexion and extension; and her sacroiliac joints were tender.  *Id.*  Further, the was

tenderness over her left and right lumbar area and bilateral paravertebral muscle spasms.

*Id.*

The ALJ addressed Dr. Bennett's opinion on Plaintiff's mental impairments

separately.  She assigned "no weight" to Dr. Bennett's opinions regarding Plaintiff's

mental status. (Doc. #5, *PageID* #71). Dr. Bennett opined that Plaintiff had extreme limitations in several areas of mental functioning. According to the ALJ, "[t]he record *only* supports mild and moderate limitations in mental functioning as further explained above and is fully supported by generally good mental status exams and the claimant's course of mental health treatment." *Id*. Substantial evidence does not support the ALJ's conclusion that the record *only* supports mild and moderate limitations. For example, the ALJ failed to mention that Dr. Bennett's opinions are consistent with Plaintiff's treating psychologist, Dr. Sowald.

Turning to Dr. Sowald's opinions, ALJ Sanders assigned them "little weight." Like the ALJ's evaluation of Dr. Bennett's opinion, she did not discuss the treating physician rule. Indeed, she does not acknowledge that Dr. Sowald is a *treating* psychologist. The ALJ refers to her as a "provider." *Id.* at 71-72.

However, the ALJ gave reasons for discounting Dr. Sowald's opinion. She found, "This questionnaire is internally consitent [sic] as well as inconsistent with the rest of the record." (Doc. #5, *PageID* #71). The ALJ explained that Dr. Sowald's opinion that Plaintiff has extreme limitations is inconsistent with GAF (Global Assessment of Functioning) scores of 45-50 because those scores fall "slightly below the moderate range."[4] *Id*. Slightly below moderate is also known as *serious*. The ALJ then assigned

---

[4] GAF scores are not necessarily reliable. Indeed, the fifth and most recent edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) no longer uses the GAF scale, in part due to "its lack of conceptual clarity (*i.e.,* including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." Liza H. Gold, *DSM-5 and the Assessment of Functioning: The World Health Organization Disability Assessment Schedule 2.0,* 42 J. Am. Acad. Psychiatry & Law 173, 174 (2014) (footnote omitted) (*available at* http://www.jaapl.org. Search by article title).

"little weight" to three exhibits because they included GAF scores of 35-45 and, according to the ALJ, the record and Plaintiff's mental status exams do not support lower GAF scores.  *Id.* at 71-72 (citing Exhibits 7F, 9F, and 17F/1-24).  This is somewhat puzzling because these lower GAF scores of 35-45 are consistent with Dr. Sowald's opinion that Plaintiff has severe limitations.  The ALJ's attempt to divide GAF scores and selectively apply them constitutes error.  *See Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) ("[A] substantiality of evidence evaluation does not permit a selective reading of the record.  'Substantiality of the evidence must be based upon the record taken as a whole.  Substantial evidence is not simply some evidence, or even a great deal of evidence.  Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'") (quoting *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984)) (internal citations and quotation marks omitted).

The ALJ also discounted Dr. Sowald's opinion because Plaintiff "serves as her grandmother's power of attorney, which would be unusual for someone with extreme limitations in concentration, persistence or pace."  (Doc. #5, *PageID* #71) (citation omitted).  The ALJ cites one of Dr. Sowald's treatment notes:  "Laura was very concerned this week about her grandma (94) who fell and broke her femur and was at Grandview Hospital.  Laura's grandma needs a blood infusion.  Laura is her grandma's Power of Attorney and has to go sign for her grandma's treatment…."[5]  *Id.* at 782.

---

[5] Coincidentally, her grandmother's doctor, Dr. Urse, was the same doctor who operated on Plaintiff's knee. Indeed, Plaintiff hoped to see Dr. Urse for future treatment.  (Doc. #5, *PageID* #782)

Although Dr. Sowald does not indicate the length of time it took for Plaintiff to sign off on her grandmother's treatment, there is no suggestion that it required her to maintain concentration, persistence, and pace on a sustained basis for any significant period of time. *See Gayheart*, 710 F.3d at 377 ("But the ALJ does not contend, and the record does not suggest, that [the claimant] could do any of these activities on *a sustained basis,* which is how the functional limitations of mental impairments are to be assessed.") (citing 20 C.F.R. § 404.1520a(c)(2); 20 C.F.R. Part 404, Subpart P, Appendix 1, at 12.00).

The ALJ likewise pointed to a trip to Gatlinburg with friends and a family outing as evidence that Plaintiff is not as limited as opined by Dr. Sowald. However, these outlying events fail to show that Plaintiff is able to perform full time work on a sustained basis. The ALJ also pointed out that Plaintiff reported that she never left the cabin in Gatlinburg because of her physical impairments, not her mental ones. This is immaterial. Both Dr. Sowald and Dr. Bennett emphasized the important relationship between Plaintiff's physical and mental impairments. Namely, Plaintiff's physical impairments affect her psychological status. Dr. Bennett opined, for instance, that her chronic pain caused her depression and anxiety. (Doc. #5, *PageID* #s 1061, 1145-46). The ALJ ignored or overlooked this relationship.

The ALJ concluded, "Overall, the opinions appear to be based on subjective complaints of the claimant and not objective mental status exams and observations." *Id.* at 71. Substantial evidence does not support the ALJ's conclusion. The ALJ overlooks

that it can be considerably more difficult to substantiate psychiatric impairments by objective laboratory testing:

> [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen,* 874 F.2d 1116, 1121 (6th Cir. 1989) (citing *Poulin v. Bowen,* 817 F.2d 865, 873-74 (D.C. Cir. 1987), quoting *Lebus v. Harris,* F.Supp. 56, 60 (N.D. Cal. 1981)).

There is no reason to question Dr. Sowald's diagnostic techniques. At the time she gave her assessment, she had treated Plaintiff approximately once a week for over two years. (Doc. #5, *PageID* #1145); *see* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). It is consistent with the assessments she provided in April 2015. (Doc. #5, *PageID* #s 748-51, 754-56). In addition, it is supported by treatment notes from Ramakrishna Gollamudi, M.D., who consistently noted that Plaintiff's mood was anxious and depressed. *Id.* at 1546, 1548, 1550.

In sum, the ALJ failed to provide good reasons, supported by substantial evidence, for rejecting Dr. Bennett's opinions and Dr. Sowald's opinions. "Because the reason-giving requirement exists to 'ensur[e] that each denied claimant receives fair process,' we

have held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley*, 581 F.3d at 407 (quoting *Rogers*, 486 F.3d at 243).

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[6]

**B.     Remand**

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand

---

[6] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

under sentence four may result in the need for further proceedings or an immediate award

of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th

Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or

where the evidence of disability is strong while contrary evidence is lacking. *Faucher v.

Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the

evidence of disability is not overwhelming and the evidence of disability is not strong

while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding

this case to the Social Security Administration pursuant to sentence four of § 405(g) due

to the problems discussed above. On remand, the ALJ should be directed to evaluate the

evidence of record, including the medical source opinions, under the applicable legal

criteria mandated by the Commissioner's Regulations and Rulings and by case law; and

to evaluate Plaintiff's disability claim under the required five-step sequential analysis to

determine anew whether Plaintiff was under a disability and whether her applications for

Disability Insurance Benefits and Supplemental Security Income should be granted.


### IT IS THEREFORE ORDERED THAT:

1.  The Commissioner's non-disability finding is vacated;

2.  No finding is made as to whether Plaintiff Laura Ort was under a
    "disability" within the meaning of the Social Security Act;

3.  This matter is **REMANDED** to the Social Security Administration under
    sentence four of 42 U.S.C. § 405(g) for further consideration consistent
    with this Decision and Entry; and

4.	The case is terminated on the Court's docket.

Date: <u>September 30, 2019</u>	<u>*s/Sharon L. Ovington*</u>
	Sharon L. Ovington
	United States Magistrate Judge